Law Offices of
WENDIE L. ELOVICH, P.A.
180 White Road, Suite 204
Little Silver, NJ   07739
(732) 842-3224
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ANTHONY KERR, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF NEWARK, CITY OF NEWARK POLICE DEPARTMENT, CAPTAIN RONALD KINDER, SERGEANT BERNARD BYNUM, DIRECTOR GARRY MCCARTHY, LIEUTENANT PABLO RODRIGUEZ, LIEUTENANT DARRIN MARESCA, LIEUTENANT SALVATORE RUSSOMANO, CAPTAIN WILLIAM SANCHEZ, and JOHN and JANE DOES 1-10, THE INSTITUTE FOR FORENSIC PSYCHOLOGY, <br><br> Defendants. | Civil Action No. 08-3660 (KSH) <br><br> AMENDED COMPLAINT |

Plaintiff, Anthony Kerr, by his attorney, Law Offices of WENDIE L. ELOVICH, P.A., as and for an Amended Complaint against the Defendants, alleges and says:

### General Allegations

1.     Plaintiff, Anthony Kerr (hereinafter "Kerr" or "Employee") is an African American Muslim Police Officer in the Newark Police Department, residing at 300 North Arlington Avenue, East Orange, New Jersey 07017.

2.      Defendant, City of Newark, provides a Police Department (hereinafter "Employer" or "Police Department" or "NPD"), and is located at 31 Green Street, Newark, New Jersey.

3.      Under N.J.S.A. 40A:14-118, a municipality, such as the City of Newark, may create a police force and provide for its maintenance, regulation and control.  The Ordinance provides for a line of authority related to police functions and, specifically, for the adoption of rules and regulations for the governing of the force, and for the discipline of its members.

4.      The Employer, City of Newark, must, and should, monitor NPD operations, but it fails to do so, along with its Police Director, Chief of Police, Deputy Chief and others in its administration.

5.      Those in control of the NPD including policymaking and enforcement individuals have ignored the blatant wrongdoing within the City of Newark Police Department and, also, its sub-Agencies.

6.      The named Defendants, through their agents, including other John and Jane Does 1-10, know, or, should be possessed of knowledge pertaining to the material facts intended to harm this Plaintiff but they have done nothing to oversee or monitor their Police Department operations and prevent retaliation or discriminatory activity.

7.      Defendant, Garry McCarthy, is currently the Director charged to correct the retaliation or discriminatory hostile work environment, but, before him the Director was Anthony Ambrose.  Neither became involved to challenge the Chain of Command reporting to them or to investigate Plaintiff's complaints and to establish any corrective

discipline.  Instead, there was, and is, an intentional neglect of duty with the Directors being proactive to wrongfully terminate Kerr.

8.      Defendants, Ronald Kinder, Bernard Bynum, Pablo Rodriguez, Darrin Maresca, Salvatore Russomano and William Sanchez, are all titled Sergeants, Lieutenants or Captains.   The aforesaid Defendants have acted with a severe discriminatory reprisal, consistently seizing opportunities to harm this Plaintiff.  There is no accountability pertaining to their intentional misconduct.   These high Supervisory Officers have engaged in retaliation and for discriminatory misconduct, while acting within the scope of their employment, so as to share the intent and purpose of the Employer.  Each may be held individually liable for aiding and abetting unlawful acts.

9.      All Police Officers, through the highest level of Command, in the City of Newark Police Department, are deemed members of a paramilitary organization and are to be judged by a stricter standard, whether for honesty or veracity in their reports and submissions, including exercise of character, and, in the enforcement of Orders, Department Rules and Regulations, and, for all policies of the Employer, including investigation, discipline and Trial Boards.

10.      There has been no internal investigation conducted on behalf of Kerr, only against him so as to make him a steady victim and he was set up for a final Trial Board where termination occurred.

11.      For decades, the City of Newark has had no independent sub-agency or unit to pursue investigations on behalf of officers.   Instead, it utilizes the IAD or Professional Standards Unit from within, which reports only to the Director of Police, Chief or Deputy Chief.  These Units are not properly trained or remain corrupt for the

power they wield.  The City Administration is reckless and indifferent to the problems of employees by custom and practice and, more specifically, caused at or by Medical Services or the IAD.

12.     Upon information and belief, Defendant, The Institute for Forensic Psychology, has been retained by the City of Newark for at least 30 years, and has lost all aspect of being any independent referring agent or source for neutral evaluations. Their counselors or psychologists purposely render officers unfit for duty and compromise their careers through unethical practices and methods.  The end goal is greater pecuniary gain to be paid to the IFP at the expense of officers.

13.     There is contemplated a strict standard of compliance by all employees of the City of Newark to comply with Departmental Rules, Regulations, written policies and practices, including General Orders and memorandum, without exception.

14.     The Employer and all Defendants are liable, joint and severally, and also, *respondeat superior* for all allegations of the within Complaint.

15.     Plaintiff filed a timely Notice of Claim pursuant to statutory requirements.

16.     Additionally, Plaintiff filed an EEOC Complaint 524-2008-0111N to find a lawful remedy, after his rights were still being ignored.  The within Complaint was filed in timely manner with a right to sue letter being sent on April 24, 2008.

### Jurisdiction and Venue

17.     Plaintiff has been subject to violation of his rights under Title VII on the Civil Acts of 1964, as amended, 42 U.S.C. Section 2000e, *et seq*. and pursuant to 42 U.S.C. §1983.  There is pendent jurisdiction under N.J.S.A. §11A:1-1 and for claims brought under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12(d), and,

also, for breaches of the Plaintiff's Superior Officers' Collective Bargaining Agreement, the New Jersey Contractual Liability Act, N.J.S.A. 59:13-5, and other common law causes of action stated herein.

18.    Events giving rise to Plaintiff's actions occurred in the District of New Jersey and venue properly lies in this District pursuant to 28 U.S.C. Sec. 1391(a).

## JURY DEMAND

19.    Plaintiff demands a trial by jury in this action.

## FIRST CAUSE OF ACTION
### (Retaliation)

20.    Plaintiff repeats and realleges the General Allegations, as if same were fully set forth at length herein.

21.    For years, Plaintiff Anthony W. Kerr has suffered retaliation, as an African American and Muslim Employee, within the Newark Police Department.  Before this action was filed, Plaintiff was caused to file a charge to the EEOC under their Docket 524-2008-00111, stating he had been subjected to disciplinary actions and other acts of harassment in a discriminatory manner and for retaliation.

22.    The Plaintiff has been caused to question the disciplinary system of the employer, which functions based on alternating purposes, and, for uneven application amongst the workforce for racism, nepotism, separatism, cronyism and a preferential treatment or favoritism, always excluding him.

23.    During years past, Plaintiff was caused to challenge whether he could wear a beard as an aspect of his religious beliefs as a Muslim, while performing his duties and he won that legal battle, but faced the consequences of the Consent Decree

entered on February 27, 2002, for litigation in the U.S. District Court, Civil Action No. 00-2368.

24.    The case went all the way up to the Supreme Court because the City of Newark continued to challenge the Court's rulings.  Anthony Kerr was Plaintiff #3 in line to be terminated for observation of his religious practices when all the cases were merged for decision.

25.    The Employer's agents have never forgiven the Plaintiff for organizing or participating in the referenced litigation against the City of Newark, and its police command structure.

26.    The lawsuit was ultimately won and criteria were set forth for protected activity, that was, accepted religious observance, practice and belief of wearing a beard, not favored by the City Administration or Newark Police Department.   The same Employer was charged with denying their practices and beliefs, threatening Officer Kerr and others with termination and denying Officer Kerr, and similarly situated Police Officers, opportunities to work special overtime events and/or failings or refusal to take appropriate action to remedy the effects of discrimination amongst the other issues.

27.    From the time of the Consent Decree to end the litigation, there was supposed to be monitoring in the workplace to prevent reprisal activity, but there was no indication of any monitoring by the Chain of Command or by the City Administration.

28.    Furthermore, the Consent Decree terminated during 2004 and Plaintiff found he was even more vulnerable to Administrative false allegations as reprisal action.

29.    For instance, Plaintiff became a victim of Captain/Deputy Chief DeMaio wielding extraordinary power and negative influence within the NPD.   Plaintiff was assigned to the Communications Division Unit (CCU), where he was the Tape Section Supervisor.

30.    The Deputy Chief was absolutely demeaning and abusive in his position and relentless in his vendetta against Kerr.  The Rules and Regulations prohibited then Captain DeMaio from violating R/R Demeanor 5:1, Conduct 5:1, Language 5:1.2, Indecent Language 18:27.

31.    Plaintiff presented his complaint to then Director Ambrose detailing entire incident(s) pertaining to Captain DeMaio and he sought intervention, knowing that he should not be receiving any retaliation for his protected activity.

32.    Nothing was done about Samuel DeMaio's misconduct, although this high placed Captain was already known as a documented abuser of authority with numerous complaints against him.  Rather, he became promoted to Deputy Chief and others in the Command recognized Kerr had become vulnerable for retaliation.

33.    Plaintiff's subsequent discipline record was purposeful retaliation through the Chain of Command, including CAP 07-117, IOP 07-164, dated 5/21/07; CAP 07-156, IOP 07-499, dated 5/26/07; CAP 07-206, IOP 07-597, dated 8/31/07; CAP 08-153, IOP 08-420, dated 07/15/08.

34.    Most of those administrative allegations were successfully defended by the Plaintiff but, as he garnered increased support, and rose to a higher ranked position, the Employer, through its agents, became more brazen to use any means against the

Plaintiff to defeat him with multiple acts of adverse employment action, leading to a wrongful removal decision.

35.    Defendants' agents' harassment included poor, shoddy, biased investigations, practices and methods controverted by NPD policy, including, but not limited to, General Order 05-04, General Order 63-15(R), Director's Memorandum 04-351, and the Director's Memorandum 04-1882.

36.    As a resultant effect, Plaintiff had to keep submitting complaints as protected activity, in each instance.  There was never any investigation on his behalf to determine any wrongdoing.

37.    Harassment by Supervisory Officers asserting inflammatory and false accusations or procedural violations against the Plaintiff became the usual routine against Kerr.  The goal was to keep punishing the Plaintiff, and it accelerated through the time period of 2007 and 2008.

38.    Lieutenant Kerr was never in violation of Department Rules and Regulations pertaining to NPD sick leave or any other alleged NPD violation set forth in the Precinct discipline recordkeeping or IAD recordkeeping or that of Medical Services.

39.    As further proof, Plaintiff had become eligible for promotions under the Department of Personnel criteria and requirements for advancement, which could hardly be ignored in light of Plaintiff's performance record.

40.    All Kerr's charges were false and retaliatory and calculated to serve as harassment and intimidation of a compliant Officer, Kerr.

41.     Before that time, in 2006, Plaintiff stated in writing his request to be placed as a team member of the Emergency Operations Center.  This team is activated at the discretion of the Chief of Police, whenever emergent conditions arise.

42.     It was always apparent the team was comprised of high ranking officers, who resided 20 to 50 miles distance, from the City of Newark.

43.     Plaintiff was ignored, in each instance, he made requests to be given that assignment although he resided no more than two miles of the City limits and he was ready and available for that assignment different than others similarly ranked.

44.     All the procedural errors of Newark Departmental Personnel became obvious in Plaintiff's case for retaliation under provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. 2000e-1 to 2000e-17, and, also, under New Jersey L.A.D., N.J.S.A. 10:5-12(d).

45.     Nothing was ever done for Kerr when he complained or submitted DP1-1001's for investigation against other Supervisory Officers and the Command, who readily appeared to be *gunning* for adverse employment action and for his termination.

46.     Instead, he was issued discipline or threats of discipline, including a 45 day suspension beginning on January 7, 2008 and ending on March 8, 2008.

47.     Anthony Kerr was subjected to more adverse employment action, IOP's and CAP's, including Trial Boards through his last days, and ordered to remain out of work.

48.     There is a retaliatory causal link to Kerr's protected activity, past and present, for adverse employment decisions which led to his final removal.

49.     The Employer cannot articulate legitimate reasons for its adverse action.

50.     The adverse employment action was the product of an admix of retaliatory intent, pretext and discriminatory reasons.

51.     For all times mentioned, Plaintiff was a member of a protected class; he was performing at a level that met the Employer's legitimate expectations, but he was set up for retaliation with false charges and adverse employment actions, serious and tangible enough to alter his compensation, terms, conditions and privileges of employment.

52.     Defendants, each and every one from the City of Newark, including agents, John Does or Jane Does 1-10, knew, or should have known, the material facts intended to harm this Plaintiff but did nothing to oversee or monitor their Police Department operations, including the Chain of Command, Internal Affairs Division, Medical Services or the Precinct, where Plaintiff worked.

53.     Plaintiff faced retaliation but the Employer's agents did not intervene to prevent harsh punishment, Police Trials and final removal.  Ultimately, this created undue financial hardship to Kerr, and, in consequence, his family members.

54.     Defendants openly, or covertly, alternated in participating in the decisionmaking process that forms the basis for the retaliatory charges and, then, wrongful termination.  This was known wrongdoing contrary to the Rules and Regulations and all written protocol and policy.

55.     Supervisory Officers, such as Kinder, Bynum, Rodriguez, Maresca, Russomano, Sanchez and Tassie, have used their capacity or power of personal participation, through actual or apparent authority, to end Plaintiff's career.

56.    In furtherance of the goal for final removal, the Command has intentionally rubberstamped Medical Service's and IAD's failings.

57.    There had been no independent or neutral oversight, training, monitoring or effort to confront Supervisory Officers at the Medical Services Unit and IAD, or to follow-up on their inquiries or reports pertaining to Kerr.

58.    Director McCarthy participated and rubberstamped the decisions and wrongful removal decision.

59.    The foregoing acts of reprisal and retaliatory action were done with malice and a wanton disregard of Plaintiff's personal rights and sensitivities and with a deliberate foreseeability of the intended harmful consequences to him.

60.    As a proximate result of the foregoing, Plaintiff was caused to suffer emotional upset and damages, including loss of wages, fringe benefits and further promotion to a Captain's rank and status along with quality of life benefits.

61.    By reason that Defendants' agents' actions were intentionally malicious retaliatory and officially sanctioned, although outrageous and egregious, Plaintiff seeks all damages, including compensatory and punitive.

WHEREFORE, Plaintiff demands Judgment against the Defendants, CITY OF NEWARK, CITY OF NEWARK POLICE DEPARTMENT, CAPTAIN RONALD KINDER, SERGEANT BERNARD BYNUM, DIRECTOR GARRY MCCARTHY, LIEUTENANT PABLO RODRIGUEZ, LIEUTENANT DARRIN MARESCA, LIEUTENANT SALVATORE RUSSOMANO, CAPTAIN WILLIAM SANCHEZ, and JOHN and JANE DOES 1-10, jointly and severally, for:

a.    Damages, compensatory and punitive and interest accruing;

b.   attorney's fees;

c.   costs of suit;

d.   for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiff;

e.   for a Declaratory Judgment stating that City of Newark must protect this Plaintiff against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a retaliatory or discriminatory bias program being implemented against Anthony W. Kerr or other statutory or contract provisions;

f.   for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace;

g.   for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, Affirmative Action Unit and the Newark Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiff from present governing sub-agencies, the Internal Affairs Division, the Professional Standards Unit, Medical Services, or other individuals with animus within the Chain of Command;

h.   AND for such other relief as the Court may deem equitable and just.

## SECOND CAUSE OF ACTION
### (Discriminatory Hostile Work Environment)

62.   Plaintiff repeats and realleges the General Allegations and the First Count, as if same were fully set forth at length herein.

63.     As aforesaid, Plaintiff was an Employee of the Newark Police Department from 1987; and he is African American and a practicing Muslim with strong religious and ethnic beliefs but always conforming to his duties and assignments.

64.     The Employer pretends to put out Director's Memorandum, General Orders and Procedures, and to adhere to Attorney General Guidelines protecting employees in their workplace.

65.     The circulated Memorandum and posted regulatory documentation states that the City of Newark enforces the New Jersey Constitution, U.S. Constitution and laws for non-discrimination, including N.J.S.A. 10:5-1 to 10:5-42, or Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. 2000e-1 to 2000e-17.

66.     Additionally, there are General Orders and Memorandum issuing from the Director of Police and Mayor's Executive Office, proclaiming to uphold these laws and to enforce them in the workplace for equal opportunity application, but the facts are opposite for a discriminatory hostile work environment contrary to the above-written law.

67.     During February 24, 2007, Plaintiff was falsely accused, charged and arrested on an allegation of domestic violence upon Jennifer Bright, a co-worker, who has since recanted and effectively nullified any Complaint against Kerr.

68.     The original Complaint promulgated against Plaintiff was not made for at least 18 hours, after the alleged occurrence, which should have alerted the investigator to the possibility of unfounded allegations.

69.     The investigation was assigned to Sergeant Bernard Bynum, who had shown a past discriminatory bias against Plaintiff, Anthony Kerr, and he was determined to find blameworthy misconduct on the part of Plaintiff.

70.     Both at the Temporary Restraining Order Hearing on March 7, 2007, and, at the Criminal Complaint Hearing, held on April 18, 2007, Officer Bright appeared and she made specific requests that all issues between them be dropped and dismissed.

71.     The Hearing Judges granted such dismissals and the same was reported to Sergeant Bynum immediately with each dismissal but he sustained a criminal law administrative violation charge, without a complainant.

72.     Sergeant Bynum did absolutely no investigation of his own against the Plaintiff to sustain any administrative charge.  (The synopsis of charges comprised a mere cut and paste of his initial reports, instead).

73.     No witnesses were interviewed, nor any area canvas or scene investigation, occurred by Sergeant Bynum.

74.     Importantly, Officer Bright worked an entire eight (8) hour shift and tour with a police Sergeant and another police officer, without making any complaint or showing any sign of injury.

75.     Nothing was observed concerning Officer Bright for the whole tour of duty and no follow-up inquiries of Department personnel were ever made by Sergeant Bynum or others within the NPD.

76.     As an adverse outcome, Officer Bright was de-gunned as a police officer and then psychologically evaluated for fitness for duty.  (She sent a text message showing her depressed state of mind, which later was used as critical evidence against her.  Meanwhile, it did not improve Kerr's status within the Employer's workplace).

77.    All the reported facts did not make sense for the alleged assault and Officer Bright was trained, equipped and/or armed to carry a weapon so the facts had to be properly investigated.

78.    In his false official reports, Sergeant Bynum referenced four excessive force complaints during Plaintiff's long career of 20 years but three of the complaints were "exonerated" and the fourth was "un-sustained".   Nevertheless, Sergeant Bynum decided the complaints were compelling and Bright's 'original' version credible, although nothing existed for corroborating proofs to punish Kerr.

79.    Moreover, Bright's psychological evaluation did not support her 'story' but rather she was found to represent a danger to Plaintiff, Anthony Kerr.

80.    On or about October 29, 2007, Plaintiff faced administrative charges before a Trial Board and Sergeant Bynum was cross-examined based on the deficiencies of his report and the psychologists firm opinion that Officer Bright was not originally truthful in bringing allegations against Plaintiff.

81.    Again, Jennifer Bright recanted her whole story to her own detriment, as a police officer but Plaintiff still obtained 15 days suspension for "conduct" and another 15 days responsibility for a total suspension period of 30 days, a definite hardship to him and his family.

82.    Subsequently, Plaintiff sought his own IOP#175 investigation for the aggressive activities of Jennifer Bright's brother, Dexter Bright, who was also another police officer.  Again, the IAD investigation went to Sergeant Bynum, and there was still another biased investigation method to discount Plaintiff's entire version of the incident,

without any proper IAD investigation, contrary to the requirements of General Order 05-04 and other Rules and Regulations or policies.

83.    As follow-up to that discriminatory biased investigation, IOP#499, CAP#156, against Plaintiff's interest, Kerr was subjected to a fitness for duty evaluation by the Employer's designated psychologist, Guillermo Gallegos, Ph.D.

84.    Defendant Captain Ronald Kinder, the head of Medical Services assigned the investigation and circulated the results that Plaintiff would be declared unfit for duty pending his attendance in a four (4) month regimen of counseling, with a licensed mental health official, reporting back to the NPD Medical Services Department.

85.    As aforesaid, Defendant, The Institute for Forensic Psychology ("IFP"), has been retained by the City of Newark for many years, and has lost all aspect of being any independent referring agent or source. Their counselors or psychologists, may or may not be licensed, but they will purposely render officers unfit for duty and compromise their careers through unethical practices and methods.

86.    The Institute for Forensic Psychology, through their agents, servants and employees, have intentionally caused Plaintiff damages through their evaluations and testing. In the final analysis, they were the decisionmaker for rendering Kerr unfit.

87.    Importantly, members of the psychological/psychiatric or medical professionals in the community have criticized the tests utilized by the Institute as having no validity or scientific use and also the evaluation procedures.

88.    Since being accused of this act of domestic violence during February 2007, Plaintiff has been subjected to psychological evaluations seven (7) times. Three of those evaluations were conducted by independent psychologists, who found Plaintiff

16

fit for duty.   Four other reports were rendered at the The Institute for Forensic Psychology and found Plaintiff unfit for duty.

89.   Plaintiff filed grievances with his Union questioning Defendants procedure and evaluations concerning him, and, more particularly, based on qualified competent psychiatrist and psychologist establishing Plaintiff as fit for duty.

90.   Valid recommendations were forwarded to the NPD through Defendant Kinder, which were rejected stating Plaintiff was fit for duty.

91.   Back at 1997, the Employer obtained a plain-written Restraining Order against the NPD overturning any duly licensed physician's test and reports pertaining to police officers such that Medical Services could not establish Plaintiff as unfit.

92.   Defendant Kinder charged Plaintiff with six (6) additional administrative violations and followed-up with costly directives to compel Plaintiff to pay for Department ordered counseling sessions.

93.   Plaintiff was caused to appear at another Trial Board on October 29, 2007, where he witnessed Defendant Kinder coached to give Trial Board testimony before three Trial Board Captains, who could no longer accept any neutral evidence.

94.   This time, Plaintiff received an additional 15 day suspension bringing him to a total of 45 days punishment.  Of the six charges, four were merged, one dismissed and, then, a harsh suspension period was imposed.

95.   The situation of cruel and egregious punishment continued with IOP#597-CAP#206 contrary to the Rules and Requirements.

96.   Plaintiff became a purposeful victim and scapegoat involving a prisoner bail processing receipt, where it was known he had no accountability, and lies were

fabricated between Lieutenants Pablo Rodriguez and Darrin Maresca, within the Internal Affairs Division ("IAD").

97.   Plaintiff did his own research and determined the bailer, a member of the NPD, and verified the other officer had more monies than he should have had but Plaintiff became charged three weeks later, on subsequent administrative violations.

98.   Lieutenant Julio Rubbet immediately advised the Command, Plaintiff was not responsible for blameworthy misconduct or any violation since he witnessed exactly what Plaintiff did in the Prisoner Processing Division.

99.   The Command responded to the real facts and appeared to exonerate Plaintiff by reassigning the investigation to the Executive Officer Salvatore Russomano but the new charges were still sustained.

100.   After review, the Deputy Chief, Joseph Tutela, rejected those results as a one sided investigation but Lieutenant Russomano ignored all the requests for clarification and proceeded to more administrative charges, without answering the Deputy Chief's direct inquiries.

101.   The investigation was forwarded to the Office of Internal Affairs and approved by the acting Captain William Sanchez, who stood to gain a promotion ahead of Plaintiff with any more discipline infractions, on Plaintiff's permanent record.

102.   On December 10, 2007, Plaintiff went to still another Police Trial where Defendant Ronald Kinder was now a Hearing Officer contemplated to hear the evidence against him.  No recusal occurred despite the rules for a meaningful Trial Board.

103.   At that time, Plaintiff was offered an option of either a punishment of six additional days suspension, bringing his total to 51 days, or be forced to agree to a

formal reprimand being placed in his permanent record.  Plaintiff was compelled to accept the reprimand knowing he could not afford even greater financial hardship.

104.   Each Trial Board proceeding had gross procedural errors for intentional results, discriminatory bias and disparate treatment.

105.   Plaintiff knows of other cases of domestic violence which were treated differently than his own situation, including Captain Steven Yablonski and his wife. Also, there was the situation of Captain Susan Cole having similar domestic issues with a boyfriend.  Each of these Captains issued discipline to him, 15 days, and 30 days, respectively, knowing Plaintiff's situation was no different than their own.  (They did not obtain similar suspension days.)

106.   The discriminatory hostile work environment grew worse over time. Plaintiff was not re-gunned and his wages were diminished with lost suspension time (45 days) and also there was no possibility of overtime without a service weapon.

107.   Defendant's Supervisory Officers recognized the Chain of Command calculated to terminate Kerr, and they contributed to create a derogatory, inflammatory and false record of discipline, which would impact Kerr's service record for retirement or pension.

108.   Defendants alternated in participating in the decision making process, which forms the basis for the alleged discrimination and retaliatory charges.  Each have been responsible for aiding and abetting known wrongdoing, contrary to the NPD Rules and Regulations or written policies.

109.   Defendants, Kinder, Bynum, Rodriguez, Maresca, Russomano and Sanchez, have used their capacity or power of personal participation, through actual or apparent authority, including the control of work site conditions to end Plaintiff's career.

110.   Director, Garry McCarthy, was proactive for Plaintiff's termination decision.

111.   Between 2007 and 2008, Plaintiff was subject to constant re-evaluation with Dr. Guller or Dr. Gallegos of The Institute for Forensic Psychology, with false and erroneous reports being made to his detriment.

112.   Furthermore, Plaintiff was constantly challenged by a discriminatory hostile work environment contrary to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. 2000e-1 to 2000e-17 or N.J.S.A. 10:5-1 to 10:5-42

113.   For all times stated, the conduct was severe and pervasive enough, including discriminatory action, to make a reasonable African American Muslim employee believe the condition of his employment has been altered and he no longer had any rights or liberties.

114.   It was all too plain that the Employer would not recognize Kerr was a member of a protected class with rights and remedies.

115.   Erroneous information or misconduct issues were presented in advance of Plaintiff's evaluations, although those charges were not sustained or determined against Kerr.

116.   At his own expense, Plaintiff has gone to efforts to become evaluated by reputable private psychologists or psychiatrists, who have completed competent medical/psychosocial evaluations and determined no further counseling is necessary.

117.   Comprehensive, valid reports were being sent to Medical Services in accord with established protocol and procedure to benefit Kerr.

118.   Nevertheless, Plaintiff was compelled to even more re-evaluations and counseling for no apparent reason, except to obtain negative harmful reports.

119.   More importantly, Plaintiff's religious convictions as a Muslim have always been the test or topic of discussion, although totally irrelevant to Plaintiff's work, as a Lieutenant at the NPD.

120.   Also, on evaluation at The Institute for Forensic Psychology, false rumors have been scrutinized to determine whether Plaintiff tells the truth pertaining to outside personal activities and when Kerr defends himself, he is considered blameworthy.

121.   For these evaluations, Plaintiff has been victimized by the Employer's psychological experts' inquiries, which are calculated to have a negative bearing on the psychological evaluation results.

122.   For all times mentioned, Plaintiff has always been compliant to the requirements of his job and even the ill founded recommendations of the Forensic Institute.

123.   Three independent psychologists have deemed Plaintiff fit for duty and have documented their objectivity in ongoing reports.

124.   As a public servant, Plaintiff suffered an undue hardship as he languished in less than a full duty capacity, without a gun and waited for charges or Police Trials, despite his cooperative status.

125.   Plaintiff's long suspension periods have kept him out of work (off payroll) from January through March 2008 and, then, he was subject to a final wrongful discharge decision, so as to end his wages and other benefits.

126.   Again, on May 27, 2008, Plaintiff was referred to the Forensic Institute of Psychology for reevaluation of his fitness for duty.  There was no fair interview process since Dr. Guller, Jr. immediately read from records sent by the Employer that Plaintiff sustained 13 separate disciplinary charges, which was malicious and erroneous information.

127.   The aforesaid Dr. Guller insisted Captain Kinder of Medical Services knew Plaintiff's full record of service contained 13 sustained complaints; 5 sustained at Police Trials and 3 charges were still pending against him.  Plaintiff could not convince the Institute evaluator that his record was different although he indicated the disciplinary record should be attached to any report.

128.   There was tainted evidence provided by Defendant Kinder or others in Medical Services, without any concern for Plaintiff's confidential investigations or permanent record.  The objective was a purposeful biased misinterpretation of Plaintiff's conduct in his personal life, and in regard to his duties at the NPD.

129.   For these times, Plaintiff offered to contact the Office of Internal Affairs for a true copy of his disciplinary record but the physician/psychiatrist stated it would not be necessary and indicated he had already made up his mind on the issue of discipline.

130.   Plaintiff was completely frustrated by the inflammatory, prejudicial accusations being processed in reports by Captain Kinder of Medical Services but there was nothing he could do.

22

131.    Plaintiff discovered information cited at IOP #2007-499 did not contain accurate information pertaining to his discipline record.   More importantly, Captain Kinder added to the charges, when he was himself conducting investigations so as to taint the evidence and recordkeeping.

132.    On May 28, 2008, Plaintiff retrieved his disciplinary records from the Office of Internal Affairs and found he received a total of four suspension days resulting from three Departmental charges.   In addition, there were only two reprimands listed and only two pending charges.  The reprimands were stale along with the pending charges and should have been closed.

133.    Plaintiff also retrieved a copy of his discipline record from the IA Pro computer system.   Again, Defendant Kinder tried to furnish inaccurate information, which should have been dismissed to taint the picture and records of Plaintiff.

134.    Plaintiff was caused to submit to Captain Raul Estevez pertaining to his religious beliefs and such reports were forwarded to Dr. Guller's office as  inflammatory information furnished by Captain Kinder of Medical Services

135.    During these times, Plaintiff's HIPPA and other rights were purposely violated.  His own private physician and psychiatrists or counselors always deemed him psychologically fit for duty.

136.    Moreover, the testing results were completely different from the private physicians or psychiatrist, but rejected by the Employer's agents.

137.    Despite the plain wording of the Restraining Order in effect against the Employer, the NPD Medical Services Unit rejected all the valid reports pertaining to Kerr.

138.   Plaintiff was not even permitted to work on a daily basis, as he awaited his final Trial Board Hearing.

139.   The IFP has become instrumental in proximately causing Plaintiff damages.

140.   By reason that Defendants' agents' actions were intentionally malicious officially sanctioned, although outrageous and egregious, in contradiction to the established protocol, Director's Memorandum, General Orders, Rules and Regulations, Plaintiff seeks all damages, including compensatory and punitive, including from the Institute for Forensic Psychology.

141.   Plaintiff was caused to suffer emotional upset and damages, including loss of wages, fringe benefits, promotions, higher rights to accrue pension and other retirement benefits along with qualify of life benefits.

WHEREFORE, Plaintiff demands Judgment against the Defendants, CITY OF NEWARK, CITY OF NEWARK POLICE DEPARTMENT, CAPTAIN RONALD KINDER, SERGEANT BERNARD BYNUM, DIRECTOR GARRY MCCARTHY, LIEUTENANT PABLO RODRIGUEZ, LIEUTENANT DARRIN MARESCA, LIEUTENANT SALVATORE RUSSOMANO, CAPTAIN WILLIAM SANCHEZ, and JOHN and JANE DOES 1-10, and THE INSTITUTE FOR FORENSIC PSYCHOLOGY, jointly and severally, for:

a.   Damages, compensatory and punitive and interest accruing;

b.   attorney's fees;

c.   costs of suit;

d.   for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiff;

e.      for a Declaratory Judgment stating that City of Newark must protect this Plaintiff against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a retaliatory or discriminatory bias program being implemented against Anthony W. Kerr or other statutory or contract provisions;

f.      for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace;

g.      for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, Affirmative Action Unit and the Newark Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiff from present governing sub-agencies, the Internal Affairs Division, the Professional Standards Unit, Medical Services, or other individuals with animus within the Chain of Command;

h.      AND for such other relief as the Court may deem equitable and just.

### THIRD CAUSE OF ACTION
**(Conspiracy)**

142.    Plaintiff repeats and realleges the General Allegations and the First and Second Causes of Action of the Complaint, as if same were fully set forth at length herein.

143.    For years, Plaintiff has faced threats and actual trumped up false charges and inaccurate reports made by Superior Officers, who know or should know, all the Rules and Regulations, written protocol and policy, General Orders and Memorandum.

144.    Specifically, Lieutenant Pablo Rodriguez, Lieutenant Darrin Maresca, Lieutenant Salvatore Russomano, Captain William Sanchez, Captain Ronald Kinder and Sergeant Bernard Bynum became involved in a conspiracy and the higher Command, including Directors Ambrose and then McCarthy, sanctioned their activity or became proactive in a conspiracy.

145.    The named Defendants acted as a combination of individuals, a confederation, entering into an agreement, with a common design for an unlawful purpose to be achieved by unlawful means to wrongfully terminate Anthony Kerr.

146.    These Defendants were involved in CAP 07-117, IOP 07-164, dated 5/21/07, CAP 07-156, IOP 07-499, dated 5/26/07, CAP 07-206, IOP 07-597, dated 8/31/07, CAP 08-153, IOP 08-420, dated 07/15/08, and there is believed to be more IOP's and CAP's.

147.    Each had a significant role in the conspiracy to be equally and vicariously liable to Plaintiff for special damages proximately caused by tortious overt acts of one or more of these conspirators in furtherance of the conspiracy.

148.    Importantly, the Internal Affairs Division or other sub-agencies, including Professional Standards Unit, Affirmative Action or other Newark sub-agencies or units, have supported this conspiracy against Plaintiff, Anthony Kerr.

149.    No one has monitored the rights of Officer Kerr despite all his efforts and submissions for proper investigations of his problems before final removal.

150.    Agents of Medical Services (internal and external), along with the Precinct Officers and IAD, have conspired to establish Plaintiff as unfit for duty and subject to charges, over and over, again.

151.   The Employer is responsible for all acts and conduct of the individually named employees within the scope of their authority; for failing to control its agents' conduct within the workplace; for promoting adverse employment action impacting this Plaintiff; and for promoting a conspiracy for a wrongful removal decision.

152.   Defendant, The Institute for Forensic Psychology ("IFP"), through its agents, servants, and employees, has deliberately aided in this conspiracy to render Plaintiff unfit for duty and caused his career to end and, in so doing, they are jointly and vicariously responsible for Kerr's damages.

153.   The charges for removal indicate at Charge 1, violation of NPD R/R Chapter 18:10 - *Department members shall not render themselves mentally or physically incapable of performing their required duties*.   Furthermore, Charge 2 compounds the violation as Civil Service Rule 4A:2-2.3 Sect. (a) 1 and 11, for the same inability to perform duties and *for other sufficient cause*.

154.   The true and blatant facts indicate that Plaintiff Kerr was unsuccessfully waging a battle to prove he was mentally and physically capable of performing his required duties, with licensed New Jersey professionals assessing him as fit for duty.

155.   Only the NPD and IFP determined Kerr was unfit.   There were corrupt methods and practices used to get false and defamatory reports from the IFP to support the Chain of Command's (conspirator's) notion that Officer Kerr was unfit for duty.

156.   The NPD Chain of Command, including Captain Kinder, Captain Tassie and both Directors, Ambrose and McCarthy, knew, and covered-up, wrongdoing, whether it be false, stale or compounded charges against Kerr.   Their combined and conspired objective was Anthony Kerr's termination.

157. If the Trial Board had followed the SOA Agreement, Plaintiff's charges would have been dismissed for the 45 day limitation and for other criteria.

158. The Employer could not discharge or pretend to impose discipline against Kerr, without good and just cause.

159. The charges, as shown for removal, occurred at June 27, 2008, but for an IOP 2007-321 and CAP 2007-085. More than a year elapsed and the proofs from Kerr's licensed clinicians in New Jersey report him as fit for duty. To show just how stale the charges were: the specification references the date of April 5, 2007, when Lieutenant Anthony Kerr responded to the IFP evaluation, conducted by Gallermo/Gallegos, who reported Kerr was unable to perform the full duties of a Police Officer.

160. As Police Director, McCarthy initiated a complete Department review, authorized by the City Council, to assess the Police Department and the Saffir/Rosetti Report issued. The aforesaid Report indicated failings in the infrastructure of the Police Department and recommended a complete review of the disciplinary process as to its application and purpose.

161. McCarthy ignored those recommendations and then failed to enact any standard of accountability. This allowed for the final harm to Plaintiff, to wit, a wrongful removal decision.

162. In furtherance of the conspiracy, Defendant McCarthy failed to ensure the orderly termination proceedings of collection of Department property and the issuance of Plaintiff's accrued time and benefits check (approximately $30,000) so as to create still more financial harm to Plaintiff, knowing Plaintiff did not have a source of income.

163. Also, the Police Director allowed Deputy Chief Samuel DeMaio, a documented abuser of authority, and a known substance abuser, to be allowed to be in command as the Deputy Chief.

164. Additionally, the Police Director allowed Captain Kinder, who was a documented substance abuser, and a psychiatric patient with anger management issues, to be in command of Medical Services.

165. Human Resources has also permitted Kinder to run Medical Services, knowing his limitations and lack of training.

166. The aforementioned Police Director further allowed Captain Dennis Tassie, who has a documented disdain for Muslims, to be in command of the Police Unit, where Plaintiff reported and worked.

167. This same Police Director McCarthy allowed a corrupt and biased Police Hearing process to be maintained and facilitated by untrained, biased and predisposed individuals, who conspired for adverse employment action against Kerr and then his final removal decision.

168. Said McCarthy knew there was a serious morale issue pervading the Department, particularly in the area of progressive discipline, with known biased Trial Board participants, which adversely impacted Kerr's removal.

169. Nevertheless, McCarthy allowed the following to continue relative to Trial Boards:  (a) the composition of police hearings were staffed with improperly trained personnel; (b) staffed with personnel who have known biased reactions and misconduct relative to gender, race, religion and work ethic; (c) staffed with personnel, who themselves had previous conflicts with the individuals being charged, but they did not

recuse themselves from the Hearings;   (d) allowed the sitting Corporation Counsel, Carolyn McIntosh, to try cases against Officers, but simultaneously continue her role as legal counsel and advisor for police hearings during closed door sessions.

170.   Therefore, Ms. McIntosh was simultaneously involved in presentation, "advocacy" for the City and, then, deliberation, which was contrary to the Trial Board rules, in effect.

171.   McCarthy deliberately avoided the Agreement protecting Superior Officers like Anthony Kerr, confirming:  Major or minor discipline of permanent employees in the Career Service of the City of Newark requires that Superior Officers must insure that all inquiries, charges, determinations or decisions are reasonable and calculated to maintain order and/or effective direction of public service, not to corrupt or encourage a sabotage of the NPD system against the NJ Attorney General Guidelines or the NPD Rules and Regulations.

172.   McCarthy knew, or should have known, the importance of Director's General Order 80-1 mandates that Superior Officers must ensure that all decisions are totally consistent with Department policies and Orders.

173.   Acts of deception, lies, false reporting, misconduct or manipulating of the rules, regulations and written policies and practices or violations of the criminal laws, Disorderly Person Act or any other City Ordinance provisions of any illegal Act, intentionally committed, as in the instant conspiracy (or by individual action), within the scope of duties, as an official act or otherwise committed is, and must be, subject to investigation and then punishment, but he ignored all NPD policy to finally terminate Anthony Kerr.

174.   In the failed environment of accountability, and due to failed training within the NPD, the Commander of Medical Services, Ronald Kinder, was the sole liaison speaking to City of Newark contracted physician(s) or psychologists at IFP or elsewhere.

175.   Moreover, in furtherance of this conspiracy, Kinder had complete custodial powers over Plaintiff's records.

176.   Said Kinder caused to be written, and forwarded, erroneous and inflammatory reports; and, then, through telephone conversations to the City of Newark contracted physician(s), he intentionally swayed their opinion against Plaintiff.

177.   From the outset, there were no neutral evaluations pertaining to Anthony Kerr at the IFP.

178.   Using his high position and authority, Defendant Kinder deliberately and recklessly acted to cause the Plaintiff to be subject to an unprecedented _seven_ (7) _psychological_ _evaluations_, fitness for duty.

179.   During these times, Kinder omitted the positive aspects of Kerr's personnel file and exaggerated all the disciplinary findings to Kerr's detriment to create negative evaluations over an 18 month period of time.   Therefore, the Employer's agents at the IFP reached negative conclusions and results to corroborate the notions of the NPD Command so as to perpetuate the conspiracy.

180.   Defendant Kinder deliberately violated a 1997 Restraining Order against the City of Newark to prohibit any member of the Police Department, or its agents, from overturning an Officer's duly licensed physician's medical decision or by personally overruling, and, without medical consultation, a written release from therapy.

181.   As aforesaid, Kinder ordered Plaintiff into an extended psychological treatment course, not paid for by the NPD, and acted against a favorable recommendation by Plaintiff's duly licensed physician.   (This adverse employment action prevented the Plaintiff from returning to full duty or utilization by the NPD.)

182.   Moreover, Kinder intentionally failed to properly maintain Department records under his care and to forward comprehensive recordkeeping to the City Authorized Physicians for their review and consideration.   This was a purposeful violation of Sick Leave Policy: Responsibilities of Medical Services Office - General Order 94-4, Section V-6, Responsibility for Own Actions 3:2.3.

183.   The exclusive liaison for the Employer, Defendant Kinder, stated in IOP #07-499:   "The lieutenant has 13 disciplinary complaints sustained against him, 5 sustained at police trials, 3 not including this one, are pending department trial." These statements, which were forwarded to treating physicians, were known to be highly inflammatory, inaccurate, and biased against Plaintiff.

184.   For other times, Defendant Kinder intentionally created biased religious criteria against Kerr, when he forwarded a Newark Police Administrative Report authored by Plaintiff, indicating his religious position on his right to wear facial hair, to the IFP, in order to prejudice the 'physician' against Kerr, so as to pretend he was an extremist, or worse.

185.   Defendant Kinder exceeded his authority when he failed to forward Plaintiff's duly licensed physician's report (Dr. Rossi report) to the City authorized physician for review and consideration. (Violation of sick leave policy: Responsibilities

32

of Medical Services Office -G.O. 94-4 section IV-H, Responsibility for Own Actions 3:2.3) Acts or Omission 18:4, Neglect of Duty, 18:6, False Statement 18:22.

186.   Moreover, there were odd off-hour meetings or communications with members of the Institute for Forensic Psychology to achieve adverse employment action against Kerr.

187.   Then, on October 29, 2007, Kinder failed to recuse himself from serving as a Trial Board Member during a Trial Board against Plaintiff (IOP #07-597), after he had been the complainant on IOP #07-499, and gave a negative/prejudiced position on Plaintiff.

188.   During December of 2007, Kinder created and perpetuated a false rumor within the Department that Plaintiff posed as Jennifer Bright's husband to a travel agent and, in a disorderly fashion, demanded to know where Bright traveled to, in the State of Florida.   Defendant further spread and perpetuated a rumor that Plaintiff traveled to the State of Florida and engaged in an act of domestic violence against Bright.

189.   Defendant Kinder then attempted to initiate an internal investigation against Kerr, but was rejected by investigators for his "witch hunt" methods, but he did not stop, there.

190.   After failing to get the desired result from the NPD, Defendant Kinder then provided the same false and unverified information to the IFP causing their evaluator to write the negative evaluation against Kerr, which Kinder sought.

191.   The only purpose of this session with the IFP was to probe the rumors regarding Plaintiff's personal life.   There were no complaints from any source, however, Plaintiff was subjected to yet another psychological interrogation process.

192.   Plaintiff wrote an administrative report, dated 5/22/08, indicating Defendant Kinder's reprisal actions to the agency, but no action was undertaken to investigate his complaint.

193.   Plaintiff filed two more reports about Defendant Kinder's misconduct and no action nor investigation ocurred, despite the requirements of General Order 05-04 and General Order 04-351, for a complete investigation.

194.   During June of 2008, after obtaining negative evaluations from The Forensic Institute of Psychology, which resulted in a recommendation of termination of Plaintiff, Defendant Kinder conspired with Lieutenant Sanchez and Captain Tassie of Internal Affairs to cause Plaintiff's Hearing date to be accelerated from August 11, 2008 to June 27, 2008, so as to be heard ahead of schedule.

195.   Thereafter, Defendants willfully and intentionally delayed the termination process by not collecting Plaintiffs Department issued equipment, and ensuring the issuance of Plaintiff's "accrued time and benefits" check (approximately $30,000), as per Department regulations, leaving Plaintiff in a "suspended status."

196.   In this suspended status, Plaintiff appeared at an Office of Administrative Law Hearing, in dress uniform as required by the Rules and Regulations, and he was arrested and falsely charged with "impersonating a police officer."

197.   Once again, Defendants abused their authority, in a retaliatory manner, due to Plaintiff filing a lawsuit and proceeding to vindicate his rights and remedies.

198.   As aforementioned, the termination of Plaintiff's position nullifies Plaintiff's promotional position to the rank of Captain. The promotion would make Plaintiff the first Muslim captain of the Newark Police agency.  Plaintiff would have been promoted to

Captain, equal in rank to Defendants, but their goal was to prevent any such promotion and remove him.

199. Ronald Kinder has been promoted through the Chain of Command to serve as Commander of the Medical Services Unit, but he takes unbridled authority to act, instead, as a medical practitioner in the place of City Authorized Physicians or Plaintiff's referring physician, and the NPD has been cautioned to cease and prevent these acts or actions in the past.

200. Indeed, General Order 94-4 limits the responsibilities of the Office of Medical Services and the Superior Officer in Charge of the Medical Services Unit to: (i) monitor the status of all personnel who are reported sick or injured; (ii) act as the liaison between the City Authorized Physician and Department personnel, and sets forth other criteria for maintaining the necessary medical records and related files for personnel like Kerr, but it was not followed.

201. In all regards to his duties and responsibilities, Defendant Kinder violated a Restraining Order against the City of Newark prohibiting any member of the Police Department, or its agents, from overturning a duly licensed physician's medical decision, specifically by "personally overruling," and without medical consultation, ordering Plaintiff into an extended psychological 'term' of treatment against a favorable recommendation by Kerr's duly licensed physician.

202. All the foregoing adverse employment action prevented the Plaintiff from returning to full duty assignment and there was an open conspiracy to remove Kerr from the NPD workplace.

203.   By July 19, 2007, Defendant Maresca was notified to investigate a miscounted bail moneybag submitted by the Plaintiff.  Along with co-defendant, Pablo Rodriguez, he conspired to inform Plaintiff that charges would be "closed without investigation," if the difference in missing monies were provided by Plaintiff.

204.   This matter is common and accepted practice under certain circumstances within the NPD.  Plaintiff innocently followed their pretextual ruse by contacting the original bailer, who, in turn, provided the (short) amount.  Three weeks later, Plaintiff was formally investigated for the alleged shortage.

205.   Defendant Rodriguez lied to the investigator when he indicated that Plaintiff told him to look in the desk draw and the money was found. This false statement as to the events caused formal NPD charges to be filed against Plaintiff.

206.   In furtherance of the conspiracy, Defendant, William Sanchez conspired to facilitate, approve and ensure that tainted, false and erroneous information and reports leading to formal charges were imposed against Plaintiff in IOP #07-164, IOP #07-499 and IOP #07-597.

207.   Lieutenant Sanchez approved flawed, incomplete and unauthorized investigations against Plaintiff in his capacity as "Acting Captain."

208.   In IOP #08-420, using the color of his authority, Sanchez, along with Captain Tassie, reopened a closed investigation, IOP #07-164, and attempted to charge Plaintiff with a weapons violation of a dismissed 2007 TRO, which was a clear violation of the NPD 45 day Rule.

209.   Additionally, Sanchez directed and attempted to have a criminal charge filed against Plaintiff, however, this was rebuffed by the Essex County Prosecutor's

Office in a statement by Prosecutor Gail Gallagher:  "I would find it very difficult to prosecute Lieutenant Kerr."

210.   Defendant Maresca violated ethical standards and confidentiality by alerting Plaintiff's relieving Supervisor (Lieutenant Ucci), through cellular conversation, of his official visit, and the actions to be taken against Plaintiff.  This was known to be a violation of Attorney General Guidelines within the State of New Jersey.

211.   Defendant, Salvatore Russomano, was the Executive Officer of the Prisoner Processing Division.  He assigned IOP #07-597 (Neglect of Duty) to Lieutenant Julio Rubbet, who was under his Command.   When the Lieutenant reviewed the investigation, he returned it to Defendant Russomano and advised him that the facts of the complaint were false.

212.   The aforesaid Russomano demanded to know of Lieutenant Rubbet how he would know that the stated facts were false.  Lieutenant Rubbet indicated that he was working with Plaintiff on the night of the incident and Plaintiff never put the money in the drawer.  Therefore, Defendant Russomano gained full knowledge of the false statements, but he disregarded it and, instead, proceeded with another false investigation.

213.   The NPD recordkeeping proves Russomano was the investigator on IOP #07-597 (Neglect of Duty), along with Rodriguez.  Their false statements are plain-written.

214.   The false statement 'irregularity' was noticed by Bureau Commander Deputy Chief Joseph Tutela, who set forth handwritten instructions to Defendant

Russomano, however, he disregarded those instructions and intentionally sustained formal charges against the Plaintiff.

215.    Defendant, Bernard Bynum, was the lead investigator for the NPD on IOP 07-164.   Through lack of training, job knowledge and the coercive influence of other conspirators in the Command, he mishandled and poorly investigated the complaint and, thereby, sustained charges without evidence against Plaintiff.   To sustain the investigation, he was required to pursue an independent location canvas, but he did not interview any tenants or neighbors, in and around the dwelling, so as to aid and abet the conspiracy.

216.    Defendant Bynum completely ignored the fact that Officer Bright worked a full (8) eight hour tour with a Police Sergeant and another Police Officer, who observed nothing about her demeanor or that she had any injuries.   Furthermore, Officer Bright personally appeared at the TRO Hearing and Court Hearing and requested a dismissal of all the charges.   Sergeant Bynum still sustained a charge of violation of criminal law against Kerr, amongst other charges.

217.    Sergeant Bynum indicated in his investigation, in bold letters, that Plaintiff had (4) four excessive force complaints in his disciplinary record, when, in fact, the complaints, occurred over 20 years.   Importantly, he failed to note that 3 complaints of force were exonerated and the last complaint was not sustained.

218.    Sergeant Bynum's reports, in whole, prove he had nothing to corroborate his findings or to sustain any complaint against Kerr of whatsoever kind.

219.    Sergeant Bynum testified at the Police Hearing that:  "He did not factor in the psychological reports behind Bright's original allegations, including evaluations, that:

(i) "Bright may not have been candid and forthcoming in her interview;" (ii) "Bright is distorting the truth to present a socially acceptable image;" (iii) "Experiencing depression;" or (iv) "She represents a danger to Lieutenant Kerr," amongst other explanations.

220.    Certainly, these records or facts were readily available to Defendant Bynum, as they were included in his investigation discovery package.  In all events, poor investigative skills, intentional acts and willful omissions led Plaintiff to be charged with another Department complaint, IOP #08-420.

221.    For all times mentioned herein, Plaintiff should have been subject to confidentiality, proper evaluations or proper investigations pertaining to all the conspired adverse employment action.

222.    Instead, Kerr's privacy and reputation have been exploited by the Employer's agents to the fullest extent possible to render him unfit for duty and finally remove him.

223.    No business necessity existed to prevent Plaintiff from working nor was there any legitimate basis to render Plaintiff unfit to carry a duty or service weapon or unfit for duty.  His career opportunities ended, abruptly.

224.    Defendants (each and every one) have failed their mission of responsibility and duty through the highest Commanding Officers, including the Directors of Police, Anthony Ambrose and, now, Defendant Garry McCarthy, to carry out this conspiracy for final removal of Kerr.

225.   Director McCarthy had the responsibility to monitor the entire workplace and make the final removal decision.  The said Director failed to take remedial action to correct wrongdoing imposed against Plaintiff.

226.   There is no possible immunity to be granted to the City of Newark under all the facts and circumstances of this conspiracy.  There was not proper legal authority, any business necessity or legitimate reason for Defendants' intentional conspiracy activities to harm Plaintiff.

227.   The aforenamed Defendants, including the IFP and other agents of the Employer, John Does 1-10 and Jane Does 1-10, aided, abetted, assisted, and knowingly committed to unlawfully harm the Plaintiff to deprive him of work and remove him.

228.   The combination of the Defendants in a conspiracy was purposeful and common design to perpetrate retaliation and a termination scheme in the final analysis for unlawful purposes, ant this includes the evaluators at the IFP.

229.   Towards that single end and objective, Defendants manipulated and distorted records, reports and influenced psychiatrists/psychologists to render Plaintiff unfit for duty and subjected him to discipline for wrongful removal.

230.   Each and every member of this conspiracy are equally and vicariously liable to the Plaintiff for causing him damages, and, special damages.

231.   Defendants (each and everyone) proximately caused adverse results by their overt, in furtherance of the conspiracy, as aforedescribed.

232.   The Defendant Employer is, and, remains, liable to Plaintiff, *respondent superior.*

233.   The  City of Newark (through its agents), and including John and Jane Does 1-10, knew, or should have known, of the material facts seriously contemplated to harm this Plaintiff, but did nothing to oversee their Police Department operations or to clean-up the known corruption, retaliation and discriminatory actions targeted to Anthony Kerr.

234.   Training has been inadequate and the worst offenders, being the Defendants, in this situation have been ignored or given the liberty to coerce other Supervisory Officers to aid and abet the within conspiracy.

235.   In the final analysis, Plaintiff was planned to be a victim although he was a Lieutenant with a good performance record for years and a highly dedicated employee.

236.   Again, the Defendant, The Institute for Forensic Psychology ("IFP"), through its agents, servants, and employees, has deliberately aided in this conspiracy to render Plaintiff unfit for duty and caused his career to end and, in so doing, they are jointly and vicariously responsible for Kerr's damages.

237.   By reason that Defendants' agents' actions were intentionally malicious retaliatory and officially sanctioned, although outrageous and egregious, to carry out a conspiracy, Plaintiff seeks all damages, including compensatory and punitive, as a common law remedy.

238.   Plaintiff was caused to suffer emotional upset and damages,  including loss of wages, fringe benefits, promotions, higher rights to accrue pension and other retirement benefits along with qualify of life benefits.

WHEREFORE, Plaintiff demands Judgment against the Defendants, CITY OF NEWARK, CITY OF NEWARK POLICE DEPARTMENT, CAPTAIN RONALD KINDER,

SERGEANT BERNARD BYNUM, DIRECTOR GARRY MCCARTHY, LIEUTENANT PABLO RODRIGUEZ, LIEUTENANT DARRIN MARESCA, LIEUTENANT SALVATORE RUSSOMANO, CAPTAIN WILLIAM SANCHEZ, and JOHN and JANE DOES 1-10, and THE INSTITUTE FOR FORENSIC PSYCHOLOGY, jointly and severally, for:

    a.    Damages, compensatory and punitive and interest accruing;

    b.    attorney's fees;

    c.    costs of suit;

    d.    for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiff;

    e.    for a Declaratory Judgment stating that City of Newark must protect this Plaintiff against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a retaliatory or discriminatory bias program being implemented against Anthony W. Kerr or other statutory or contract provisions;

    f.    for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace;

    g.    for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, Affirmative Action Unit and the Newark Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiff from present governing sub-agencies, the Internal Affairs Division, the Professional Standards Unit, Medical Services, or other individuals with animus within the Chain of Command;

h.      AND for such other relief as the Court may deem equitable and just.

## FOURTH CAUSE OF ACTION
### Breach of Contract
### (Violation of Good Faith and Fair Dealing Covenants)

239.    Plaintiff repeats and realleges the General Allegations and the First, Second and Third Causes of Action of the Complaint, as if same were fully set forth at length herein.

240.    For all times mentioned, Plaintiff, Anthony Kerr's, appeared in the Employer's workplace, as African American and Muslim and he had a right to seek his lawful remedies when his rights were trampled in the past for his religious beliefs.  As aforesaid, there has been retaliation for his prior lawsuit and he has been targeted for a hostile work environment.

241.    Plaintiff is to be protected by a firm Superior Officers' Collective Bargaining Agreement and through other regulatory and discipline mechanisms, protocol and procedures purportedly developed to control the workplace but nothing is enforced when the Command sanctions wrongdoing, covertly or overtly.

242.    Further, the Newark Police Department pretends to put out Director's Memorandum, General Orders and Procedures, and to adhere to Attorney General Guidelines protecting employees in their workplace, but no enforcement occurs in the situation of Anthony Kerr.

243.    The circulated Memorandum and posted regulatory documentation states that the City of Newark enforces the New Jersey Constitution, U.S. Constitution and other legislative mandates, whether it be pursuant to N.J.A.C. 4A:2-2.3(a), N.J.A.C. 40A:14-118, N.J.S.A. 10:5-1 to 10:5-42, or Title VII of the Civil Rights Act of 1964, 42

U.S.C.A. 2000e-1 to 2000e-17.   There were even General Orders issuing from the Mayor's Executive Office, and that of the Police Director, pretending to uphold these laws and enforce them.

244.   Defendants (each and everyone) dare to breach provisions of their Agreement, procedures and regulations, in place to protect this Plaintiff.   There is a cover-up of their wrongdoing notwithstanding the written protocol.

245.   Higher Newark Administration, including, John and Jane Does 1-10, should have intervened to clean up the NPD long before this lawsuit was filed, but nothing was done, although Plaintiff complied to the New Jersey Contractual Liability Act, <u>N.J.S.A.</u> 59:13-5.

246.   In all incidents impacting Plaintiff in his workplace there was a failure to adhere to any good faith and fair dealing and mixed motives prevailed to carry out a wrongful termination scheme.

247.   For years, Plaintiff has suffered a continuing violation case based on his past history of litigation against the Employer.   There have been trumped up false charges, threats of charges, reprimands, invasion of Kerr's privacy and other breaches of the SOA Contract.

248.   Medical Services, the Internal Affairs Division or Professional Standards Unit, or other Newark sub-agencies, always supported the retaliatory animus of the Chain of Command.

249.   Upon information and belief, the Defendant, The Institute for Forensic Psychology ("IFP"), has worked with the City for decades.   Through its agents, servants, and employees, the IFP is believed to be contracted to the City of Newark and agrees to

work to determine fitness for duty.  Here, the IFP has deliberately aided in wrongdoing to render Plaintiff unfit for duty and caused his career to end and, in so doing, they are jointly and vicariously responsible for Kerr's damages.

250.   The IFP, through its agents, servants and employees, have professional obligations and licensing or certifications requiring each evaluator to properly determine medical or psychosocial status of NPD Police Officers and they deliberately fail their professional obligations, as would impact Kerr.

251.   Public investigations have recently revealed that Vincent Gagliano was hired, as a felon, and that he should not have even been carrying a gun based on his criminal history from the outset.  Meanwhile, this Plaintiff was fit for duty but was not permitted to carry a gun, personal or service.  Kerr was deprived of earning his full wages including overtime before he was removed or terminated.

252.   The City of Newark pretends it has a diversified workforce but there is still a "color ladder," religious and other discrimination bias filtering into the Plaintiff's workplace.  The City Administration will not become involved to resolve wrongdoing or even seek reports or information of what transpires.

253.   Police Officers identified by Plaintiff were higher ranked officers, and they appeared to be beyond investigation or any discipline or training.  In all events, they were intentionally retained in their high positions and allowed liberties to deliberately harm Plaintiff's career.

254.   For all times mentioned, Defendants knew the corruption within the NPD and published reports have issued to educate or inform them of the breaches of the Agreement between the Employer and Employees, as would impact Plaintiff.

255.   The record for this Plaintiff indicates the Employer condoned and intentionally tolerated the various forms of misconduct, retaliation and discrimination for deliberate adverse conditions within Newark's workplace.

256.   For years, this Plaintiff has been adversely treated to extreme and severe conduct but he has remained compliant to all his duties.

257.   Notwithstanding the pretense of official written policies, protocol and procedure, Director's Memorandum and the standing General Orders, Defendants kept issuing charges to punish Plaintiff just to cover-up wrongdoing.

258.   The foregoing directives and written policies of the City of Newark meant absolutely nothing and were not enforced in Plaintiff's workplace nor were the State Attorney General's Executive policies enforced.

259.   Defendants, including John and Jane Does 1-10, did not properly train, oversee, supervise or monitor the Newark Police Department operations to prevent the foreseeable harm to this Plaintiff or otherwise act to protect him.

260.   Additionally, there is the City of Newark's failure to oversee the Newark Police Department in accord with N.J.S.A. 40A:14-118.

261.   There have not been any good faith efforts to comply with the Superior Officers' Collective Bargaining Agreement or regarding the protection of civil rights or to prevent discrimination or retaliation in Plaintiff's workplace.

262.   As aforesaid, there have been intentional violations of all covenants of good faith and fair dealing, and this would include the IFP for joint and several liability to Kerr.

263.   For all these times, Defendants have intentionally breached Plaintiff's rights and provisions of the Superior Officers' Collective Bargaining Agreement, to his detriment and proper notice was filed, N.J.S.A. 59:13-5.

264.   As a proximate result of the foregoing, Plaintiff was caused to suffer emotional upset and damages, including loss of wages, fringe benefits, promotions, higher rights to accrue pension and other retirement benefits along with qualify of life benefits.

265.   By reason that Defendants' agents' actions were intentionally malicious, retaliatory and officially sanctioned, although outrageous and egregious, in contradiction to established protocol and procedures, Plaintiffs seeks all damages, including compensatory and punitive.

WHEREFORE, Plaintiff demands Judgment against the Defendants, CITY OF NEWARK, CITY OF NEWARK POLICE DEPARTMENT, CAPTAIN RONALD KINDER, SERGEANT BERNARD BYNUM, DIRECTOR GARRY MCCARTHY, LIEUTENANT PABLO RODRIGUEZ, LIEUTENANT DARRIN MARESCA, LIEUTENANT SALVATORE RUSSOMANO, CAPTAIN WILLIAM SANCHEZ, and JOHN and JANE DOES 1-10, and THE INSTITUTE FOR FORENSIC PSYCHOLOGY, jointly and severally, for:

a.    Damages, compensatory and punitive and interest accruing;

b.    attorney's fees;

c.    costs of suit;

d.    for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiff;

e.      for a Declaratory Judgment stating that City of Newark must protect this Plaintiff against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a retaliatory or discriminatory bias program being implemented against Anthony W. Kerr or other statutory or contract provisions;

f.      for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace;

g.      for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, Affirmative Action Unit and the Newark Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiff from present governing sub-agencies, the Internal Affairs Division, the Professional Standards Unit, Medical Services, or other individuals with animus within the Chain of Command;

h.      AND for such other relief as the Court may deem equitable and just.

## FIFTH CAUSE OF ACTION
### (Wrongful Termination)

266.    Plaintiff repeats and realleges the General Allegations, and the First, Second, Third and Fourth Causes of Action of the Complaint, as if same were fully set forth at length herein.

267.    As aforesaid, Plaintiff is set up for a wrongful termination scheme with a pending Trial Board determination set for September of 2008.  Before that time, he was not permitted to work for the NPD.  The foregoing program is contrary to Title VII of the

Civil Rights Act of 1964, 42 U.S.C.A. 2000e-1 to 2000e-17 or N.J.S.A. 10:5-1 to 10:5-42.

268.   There was not due process Trial Board determination with an opportunity to be heard.  Before this time, Plaintiff had been caused to waive his rights against his better judgment because of the difficult and severe hardship of long suspension periods impacting his household and finances.

269.   For all times stated herein, Plaintiff has been made a constant victim, whether by reason of retaliation for filing litigation, submissions or for engaging in protected activity and, also, for exposing wrongdoing at the IFP.

270.   Plaintiff has always suffered disparate treatment as compared to others preferred in the workplace.

271.   There were never any facts to justify any trained Supervisory Personnel to establish false charges, false reports or felonious medical recordkeeping against Plaintiff's rights except that there are no monitors or independent overseers.

272.   Furthermore, the Employer pretends it offers protected status or equal opportunity but the facts are very different for Anthony Kerr.

273.   Defendants (each and every one) intentionally participated in a program to wrongfully terminate Plaintiff against the law, and this would include the agents, servants and employees of the IFP.

274.   Defendants intentionally violated all their written policies and rules and regulations, as would protect Plaintiff and he has been subjected to ongoing punishments and charges, including suspension, and, now, termination with a final removal decision.

275.   For these times, Kerr always appeared compliant for all medical and psychological evaluations required of him and proved himself fit for duty.   *But for* Defendants imposing retaliatory harassment, hardship and discriminatory altered work conditions, Plaintiff would still be working at NPD.

276.   Plaintiff was intentionally set up for a calculated wrongful termination decision and, specifically, for removal for being unfit for duty.   As aforesaid, there was no effort for any meaningful Trial Board and IFP personnel deliberately participated for optimum financial gain by repetitive evaluations, testing and even giving reports and testimony against Kerr.

277.   All tests and evaluations were deliberately biased and prejudiced against Kerr from the outset at the IFP and the end results were the same.

278.   As a direct and proximate result of the foregoing, overt and covert, practices and methods, Plaintiff was unfairly punished and subject to final termination with a removal decision.

279.   As a result and effect of the foregoing, Plaintiff was caused to suffer emotional upset and damages,   including loss of wages, fringe benefits, promotions, higher rights to accrue pension and other retirement benefits along with qualify of life benefits.

280.   By reason that Defendants' agents' actions are, and were, intentionally malicious, retaliatory and sanctioned in contradiction to establish protocol and procedures, Plaintiffs seek all damages, including compensatory and punitive.

WHEREFORE, Plaintiff demands Judgment against the Defendants, CITY OF NEWARK, CITY OF NEWARK POLICE DEPARTMENT, CAPTAIN RONALD KINDER,

SERGEANT BERNARD BYNUM, DIRECTOR GARRY MCCARTHY, LIEUTENANT PABLO RODRIGUEZ, LIEUTENANT DARRIN MARESCA, LIEUTENANT SALVATORE RUSSOMANO, CAPTAIN WILLIAM SANCHEZ, and JOHN and JANE DOES 1-10, and THE INSTITUTE FOR FORENSIC PSYCHOLOGY, jointly and severally, for:

a.    Damages, compensatory and punitive and interest accruing;

b.    attorney's fees;

c.    costs of suit;

d.    for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiff;

e.    for a Declaratory Judgment stating that City of Newark must protect this Plaintiff against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a retaliatory or discriminatory bias program being implemented against Anthony W. Kerr or other statutory or contract provisions;

f.    for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace;

g.    for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, Affirmative Action Unit and the Newark Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiff from present governing sub-agencies, the Internal Affairs Division, the Professional Standards Unit, Medical Services, or other individuals with animus within the Chain of Command;

h.    AND for such other relief as the Court may deem equitable and just.

## DESIGNATION OF COUNSEL

Pursuant to the Federal Rules, WENDIE L. ELOVICH, ESQ. is hereby designated as Trial Counsel for the Plaintiff in the within matter.


Dated:   February 12, 2009                 Law Offices of
                                           WENDIE L. ELOVICH, P.A.
                                           Attorney for Plaintiffs


                                    By: /s/Wendie L. Elovich_____
                                           WENDIE L. ELOVICH, ESQ.